**[J-42A-2025, J-42B-2025, J-42C-2025, J-42D-2025, J-42E-2025, J-42F-2025, J-42G-2025 and J-42H-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| IN RE: CHESTER WATER AUTHORITY TRUST | : | No. 46 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 489 CD |
| APPEAL OF:  CHESTER WATER AUTHORITY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 217-2019- |
| | : | O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED:  May 14, 2025 |
| IN RE: CHESTER WATER AUTHORITY TRUST | : | No. 47 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 504 CD |
| APPEAL OF: CHESTER WATER AUTHORITY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 0217- |
| | : | 2019-O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED:  May 14, 2025 |
| CITY OF CHESTER | : | No. 48 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 514 CD |
| | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| CHESTER WATER AUTHORITY NICOLE WHITAKER, WANDA MANN, MICHELLE CONTE, TYLER THERRIAULT, ESQUIRE, KATHRYN A. TOWNSEND, VICTOR S. MANTEGNA, JAMES D. NEARY, DIANE | : | County Court of Common Pleas, |
| | : | Civil Division, at No. CV-2019- |
| | : | 005976 dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED:  May 14, 2025 |

| | | |
|---|---|---|
| AND JAMES BOHR AND WOLF EQUITY, L.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: CHESTER WATER AUTHORITY | : | |
| | | |
| IN RE: CHESTER WATER AUTHORITY TRUST | : | No. 49 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 685 CD |
| APPEAL OF: CHESTER WATER AUTHORITY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 0217- |
| | : | 2019-O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED: May 14, 2025 |
| | | |
| IN RE: CHESTER WATER AUTHORITY TRUST | : | No. 50 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 489 CD |
| CROSS APPEAL OF: CHESTER COUNTY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 217-2019- |
| | : | O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED: May 14, 2025 |
| | | |
| IN RE: CHESTER WATER AUTHORITY TRUST | : | No. 51 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 504 CD |
| CROSS APPEAL OF: CHESTER COUNTY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 0217- |
| | : | 2019-O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED: May 14, 2025 |

| | | |
|---|---|---|
| CITY OF CHESTER | : | No. 52 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 514 CD |
| | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| CHESTER WATER AUTHORITY NICOLE | : | County Court of Common Pleas, |
| WHITAKER, WANDA MANN, MICHELLE | : | Civil Division, at No. CV-2019- |
| CONTE, TYLER THERRIAULT, ESQUIRE, | : | 005976 dated April 24, 2020 and |
| KATHRYN A. TOWNSEND, VICTOR S. | : | Remanding |
| MANTEGNA, JAMES D. NEARY, DIANE | : | |
| AND JAMES BOHR AND WOLF EQUITY, | : | ARGUED:  May 14, 2025 |
| L.P. | : | |
| | : | |
| | : | |
| | : | |
| CROSS APPEAL OF:  CHESTER COUNTY | : | |

| | | |
|---|---|---|
| IN RE:  CHESTER WATER AUTHORITY | : | No. 53 MAP 2022 |
| TRUST | : | |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 685 CD |
| CROSS APPEAL OF:  CHESTER COUNTY | : | 2020 dated September 16, 2021 |
| | : | Reversing the Order of the Delaware |
| | : | County Court of Common Pleas, |
| | : | Orphans' Division, at No. 0217- |
| | : | 2019-O dated April 24, 2020 and |
| | : | Remanding |
| | : | |
| | : | ARGUED:  May 14, 2025 |

## OPINION

**JUSTICE DONOHUE**                                         **DECIDED:  January 21, 2026**

This case of statutory construction concerns the City of Chester's ("City") asserted power to convey the assets of the Chester Water Authority ("CWA") to itself.  CWA was created nearly a century ago to serve City's water needs but today most of its ratepayers come from thirty-three other municipalities located across both Chester and Delaware Counties.  Until 2012, City continued to have the sole power to appoint representatives to CWA's five-member board ("Old Board").  That changed when the General Assembly

amended[1] the Municipality Authorities Act ("MAA")[2] with the addition of Section 5610(a.1). Due to profound changes in the geographic demographics of CWA's ratepayers, Section 5610(a.1) transformed the Old Board into a nine-member board with City, Chester County, and Delaware County each receiving equal representation ("New Board").

Five years later, after the New Board rejected an unsolicited bid by Aqua Pennsylvania Inc. ("Aqua") to purchase CWA, CWA filed a petition ("Trust Petition") in the Delaware County Court of Common Pleas seeking to transfer CWA's assets into a trust. City and Aqua objected, claiming City retains exclusive control over conveyances of CWA's assets pursuant to Section 5622(a) of the MAA. While the Trust Petition was pending, City filed a declaratory judgment action seeking to validate its claimed power under Section 5622(a). Ultimately, the trial court issued orders on preliminary objections in both actions on a common statutory question, holding that City could no longer unilaterality convey CWA's assets without the consent of Delaware and Chester Counties. A divided Commonwealth Court then reversed, holding that City retained the power to unilaterally obtain CWA assets irrespective of Section 5610(a.1).

The Commonwealth Court erred in its statutory interpretation of Section 5622(a). Any unilateral power City held to convey CWA's projects under Section 5622(a) did not survive Section 5610(a.1). Accordingly, we reverse the decision of the intermediate court.

**Background**

In 1939, City incorporated the CWA under its former name (the Chester Municipal Authority) pursuant to the MAA of 1935.[3] CWA then purchased investor-owned utility,

---

[1] Act of June 27, 2012, P.L. 653, No. 73 ("Act 73").

[2] 53 Pa.C.S. §§ 5601-5623.

[3] *See* Act of June 28, 1935, P.L. 463, No. 191 ("1935 MAA"). Two major reenactments followed. The 1935 MAA was repealed and replaced by the Act of May 2, 1945, P.L 382, (continued…)

Chester Water Service Company, funded solely from the Chester Municipal Authority's issuance of municipal bonds in December of 1939. City later renewed CWA's charter under the 1945 MAA in 1965, at which time it gave CWA its current name. In 1998, City again renewed CWA's charter under the 1945 MAA, just prior to the recodification of the MAA in 2001. The Old Board governed CWA until 2012 when it was replaced by the New Board by operation of Section 5610(a.1).

At its inception, the Chester Municipal Authority sourced its water directly from the adjacent but heavily polluted Delaware River. Peter K. MacEwen, *The History of Chester Water Authority 1866-1985* 25, 45, 52-53, 73 (1985). In 1948, work began to dam the Octoraro Creek, forming the Octoraro Reservoir, which CWA utilized to deliver cleaner water to City and surrounding communities by 1951. *Id.* at 81-93. Given the Octoraro Reservoir's location on the western border of Chester County, and City's location in southcentral Delaware County, CWA's infrastructure (i.e., its water treatment, storage, and delivery projects) rapidly grew outside of City's municipal boundaries and across a significant expanse of both Chester and Delaware counties. *Id.* at 74, 83, 88, 138-39 (describing various CWA projects that facilitated the transportation of water from the Octoraro Reservoir to City and surrounding municipalities). CWA has always been funded solely by municipal bonds and ratepayers and beyond its status as a ratepayer, City has never contributed financially to the CWA.

In 2017, five years after the New Board took control, Aqua made an unsolicited bid to purchase CWA for $320 million. *In re Chester Water Auth. Tr.*, 263 A.3d 689, 693 (Pa. Commw. 2021) ("*Chester Water*"). The New Board unanimously voted to reject the offer. *Id.* Repeatedly designated as a financially distressed municipality, City began exploring

---

No. 164 ("1945 MAA") (formerly 53 P.S. §§ 301-322). Most recently, Section 3 of the Act of June 19, 2001, P.L. 287, No. 22 ("Act 22") recodified the 1945 MAA.

methods to monetize CWA's assets. *Id.* In light of those efforts and Aqua's bid, in early 2019, CWA "executed a declaration of trust, naming [CWA] as the settlor and three of its board members as trustees." *Id.* The terms of the trust contemplated that CWA "would transfer its assets into the trust." *Id.* Soon thereafter, CWA filed the Trust Petition. Several interested parties, including City and Aqua, objected. *Id.* City and Aqua filed separate motions for judgment on the pleadings, asserting that the Trust Petition should be denied as a matter of law, claiming only "City had the power to transfer [CWA]'s assets under section 5622(a) of the MAA." *Id.*

As the Trust Petition litigation was ongoing, City filed a complaint against CWA ("Declaratory Judgment Action") seeking declaratory judgment "that section 5622(a) of the MAA vested it with the statutory authority to unilaterally obtain and sell" CWA, and seeking to enjoin CWA "from interfering with … City's right to sell the Authority's assets," and to prevent CWA "from encumbering or dissipating [CWA]'s assets, and from burdening [CWA]'s assets with any new debt." *Id.* After CWA filed an answer, City subsequently moved for judgment on the pleadings. Ultimately, in separate orders dated April 24, 2020, the trial court denied the motions for judgment on the pleadings in both actions, concluding that any conveyances pursuant to Section 5622(a) be conducted solely by the new governing body of the CWA, i.e., City, Chester County, and Delaware County acting "in unison[.]" *Id.* (citation omitted).

The trial court certified its orders for appeal pursuant to 42 Pa.C.S. § 702(b), and City and Aqua filed petitions for permission to appeal to the Commonwealth Court in both cases pursuant to Pa.R.A.P. 1311(b). *Chester Water*, 263 A.3d at 693-94. The Commonwealth Court granted the petitions for permission to appeal and consolidated the cases, accepting for review the question of whether the 2012 amendment to the MAA, in establishing City, Chester County, and Delaware County as the governing body of CWA,

requires that "any conveyance of [CWA]'s assets pursuant to the MAA be conducted and authorized by the governing body rather than solely by … City."  *Id*. at 694 (brackets omitted).

**Decision Under Review**

In a published opinion authored by Judge McCollough, an en banc panel of the Commonwealth Court reversed and remanded for further proceedings.  *Chester Water*, 263 A.3d at 707.  The court found that Section 5610(a.1) "did not abrogate, supersede, or otherwise alter a municipality's longstanding power under Section 5622(a) and its statutory predecessors to unilaterally obtain an authority and/or its assets."  *Id*. at 692.

The court first discussed the history of Section 5622(a), beginning with former Section 18(A) of the 1945 MMA, which the court observed contained language that was "virtually identical" to the language presently contained in Section 5622(a) and left untouched by Act 73.  The court then explained that, in *Clearfield Borough v. Clearfield Borough Park Authority*, 285 A.2d 532 (Pa. Commw. 1971) ("*Clearfield*"), *affirmed*, 301 A.2d 372 (Pa. 1973) (per curiam), it held that Section 18(A) allowed the municipality to unilaterally obtain project property of the authority without the authority's consent.  *Chester Water*, 263 A.3d at 696.  The Commonwealth Court reaffirmed that holding in *Forward Township Sanitary Authority v. Township of Forward*, 654 A.2d 170 (Pa. Commw. 1995) ("*Forward Twp.*"), and *Township of Forks v. Forks Township Municipal Sewer Authority*, 759 A.2d 47 (Pa. Commw. 2000) ("*Twp. of Forks*").  Thus, the intermediate court determined that it was "settled law" that a municipality "has the power to unilaterally direct its authority to transfer authority property without the consent of the authority."  *Chester Water*, 263 A.3d at 697 (quoting *Twp. of Forks*, 759 A.2d at 54).

Next, the court noted that during the 2001 recodification of the MAA, the General Assembly stated under Section 2 that "the provisions of the MAA, so far as they are the

same as those of existing laws, are intended as a continuation of such laws and not as new enactments," and under Section 4 that "decisions which are made under the 1945 MAA shall remain in full force and effect until revoked, vacated or modified under the MAA." *Id*. (internal quotation marks omitted). The Commonwealth Court viewed these provisions as expressing the General Assembly's "clear intent to preserve existing case law interpreting the 1945 MAA, unless or until a provision of the MAA provides the contrary." *Id*.[4]

Given that the legislature did not amend the 1945 MAA or Section 5622 of the MAA "with any material language that could call into question the construction placed upon those statutes" by the court's prior decisions, the court found that the General Assembly intended to readopt the Commonwealth Court's decisional law into Section 5622 of the MAA. *Id*. at 698-99. Specifically, the court found that its decisions had held that "former section 18(A) of the 1945 MAA and section 5622(a) of the current MAA provide a municipality with the unilateral authority to obtain the assets of an authority **it had created**." *Id*. at 699 (emphasis added).

Framing the question before it as implicating Section 1933 of the Statutory Construction Act,[5] the Commonwealth Court determined that it was "unable to perceive

---

[4] Consistent with that notion, the intermediate court highlighted that, "in passing," it reaffirmed in *Salem Township Municipal Authority v. Township of Salem*, 820 A.2d 888 (Pa. Commw. 2003) ("*Salem Twp.*"), that current Section 5622(a) of the MAA authorized the township in that case to dissolve its authority. *Chester Water*, 263 A.3d at 697.

[5] Section 1933 provides as follows:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the

(continued…)

a conflict … between the two statutory sections at issue, for, based upon their plain language, the two can readily be interpreted in a state of harmony" and consistent with *Clearfield* and its progeny. *Id*. at 700. It reasoned that Section 5622 and Section 5610(a.1) could be read in pari materia to be consistent with its case law insofar as Section 5622(a) grants a municipality, via a duly enacted ordinance, the power to dissolve an authority and obtain and later transfer or convey the authority's assets, whereas Section 5610(a.1) merely provides "a particular scheme pertaining to the composition of the 'governing body' of a 'water or sewer authority incorporated by one municipality'" which "provides water or sewer services to residents in at least two counties." *Id*. at 701 (quoting 53 Pa.C.S. § 5610(a.1)). The court further observed that nothing in the language of Section 5610(a.1) could be construed as signifying an intent by the legislature to alter or displace the court's pertinent case law and settled construction of Section 5622(a). *Id*. at 702-03 (stating "at best, section 5610(a.1) is silent with respect to, and does not directly touch upon, the subject matter of section 5622(a)").

Accordingly, the Commonwealth Court reversed the trial court's orders denying City and Aqua's motions for judgment on the pleadings, concluding that the addition of Section 5610(a.1) did not supersede a municipality's statutory power to compel the conveyance of an authority and its assets and, thus, that City had the sole power to acquire and dispose of CWA's assets under Section 5622(a) without CWA's consent. However, given that the court did not consider whether City satisfied all the conditions set forth in Section 5622, or whether City could obtain all of CWA's assets, the court remanded the matter to the trial court for further proceedings. *Id*. at 706.

---

manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S. § 1933.

Judge Wojcik authored a dissenting opinion joined by then-Judge Cohn Jubelirer. In his view, the CWA's board is no longer "a board appointed by a municipality" for purposes of Section 5622(a) by operation of Section 5610(a.1). As a result, Judge Wojcik would have found that City may no longer unilaterally make decisions for CWA without the approval of the other two municipalities represented on the New Board.

While Judge Wojcik conceded that Chester and Delaware Counties did not incorporate CWA or otherwise adopt a resolution or ordinance signifying their intent to jointly organize, he nevertheless viewed Section 5610(a.1) as "elevat[ing] the Counties to 'joining municipalities' for all practical intents and purposes" by replacing the existing board appointed by City with a new board appointed by City and the Counties. *Chester Water*, 263 A.3d at 710 (Wojcik, J., dissenting). Judge Wojcik explained that "[b]y assigning the Counties membership on the board equal to … City's membership, the General Assembly did by legislative fiat what the municipalities could have done themselves by jointly incorporating at CWA's inception or later adopting a resolution or ordinance signifying their intention to jointly organize." *Id*. (emphasis omitted) (internal quotation marks omitted) (citing 53 Pa.C.S. § 5603(a)).

Noting that the vast majority of CWA's ratepayers reside outside of City, Judge Wojcik found it "patently unconscionable" to allow City to pay off its debt by selling the Authority's assets. Indeed, in Judge Wojcik's view, the General Assembly enacted Section 5610(a.1) to give the Counties "seats at the table" and to prevent City "from looting" CWA and "using the sale of [CWA]'s assets as its own municipal piggy bank." *Id*. at 713. Thus, in light of the foregoing, Judge Wojcik would have affirmed the trial court's order.

Following the Commonwealth Court's decision, CWA filed a Petition for Allowance of Appeal at 519-522 MAL 2021, and Chester County filed a Cross-Petition for Allowance of Appeal at 569-572 MAL 2021.

## Issues

We granted review of the following issues raised by CWA:

> (1) Does [City] have the right to seize the assets of [CWA] pursuant to Section 5622(a) of the [MAA], 53 Pa.C.S. § 5622(a), and sell those assets to address its own unrelated financial distress, while overriding the representational rights granted by Act 73 of 2012, 53 Pa.C.S. §§ 5610(a.1), 5612(a.1), to Delaware and Chester Counties?
>
> (2) Did the Commonwealth Court commit reversible error by failing to follow *Burke v. N. Huntingdon Twp. Mun. Auth.*, 136 A.2d 310, 313-14 (Pa. 1957), which is controlling precedent that only an authority can authorize transfer under the predecessor to Section 5622(a)?

*In re Chester Water Authority Trust*, 276 A.3d 203, 204 (Pa. 2022) (per curiam).

We also granted review of the following issue raised by Chester County:

> When a municipality is statutorily mandated to appoint members to a water or sewer authority board pursuant to Section 5610(a.1) of the [MAA], does the [MAA] provide such a municipality with the same rights to convey authority property as a municipality who voluntarily joins a joint authority pursuant to Section 5610(a)(2)?

*Id*.

## Parties' Arguments

### *CWA*

CWA contends that the Commonwealth Court erred by interpreting Act 73 through the lens of its own decisional case law while simultaneously overlooking this Court's decision in *Burke*, which it views as "undisturbed legal precedent" that "makes clear that … City cannot convert the assets of" CWA without the approval of its existing board. CWA

Brief at 19. According to CWA, *Burke* construed language identical to Section 5622(a) from its predecessor in Section 18 of the MAA of 1945 to require approval of an authority before its assets are transferred to an incorporating municipality. *Id*. at 21. Thus, CWA maintains that *Burke* commands that City can neither seize nor force the transfer of CWA's assets without its approval. *Id*. at 22. CWA highlights that *Burke* stated, "no less than three separate times," that "such a transfer … 'must be accomplished by an appropriate resolution or ordinance adopted by the Authority.'" *Id*. at 23 (emphasis omitted) (quoting *Burke*, 136 A.2d at 313). CWA maintains that the Commonwealth Court erroneously relied instead on its own precedent in *Clearfield* and contests how the court construed the conflicting portions of *Burke* as mere dicta. *Id*. at 24. CWA argues that only this Court can determine "what *Burke* means[.]" *Id.* In its view, *Burke's* holding supports the trial court's determination that City cannot exercise unilateral control over CWA's assets and urges us to not depart from that precedent today. *Id*. at 25. CWA argues that this Court's decision in *Gemmill v. Calder*, 3 A.2d 7 (Pa. 1938), also supports the conclusion that City cannot unilaterally seize CWA's assets.[6] City, CWA argues, has never contributed to the costs to improve the authority. To the contrary, CWA was fully self-financed through issuance of water revenue bonds at its inception "along with water rates paid by [CWA]'s ratepayers." *Id.* (citing *Rankin*, 68 A.2d at 462). "As with *Burke*," CWA asserts, "the Commonwealth Court consciously chose to ignore this Court's decision in *Gemmill*." *Id*. at 28.

---

[6] In *Gemmill*, eight municipalities created an authority but only four of them later contracted to establish a new pumping station. A taxpayer challenged the plan, arguing that the non-contracting municipalities could obtain a windfall from the project despite not contributing to its cost. The *Gemmill* Court rejected that argument, holding that the pumping station "would pass only to those that contributed to the cost of the improvement." *Gemmill*, 3 A.2d at 10. *Gemmill* went on to interpret Section 5622(a)'s predecessor in the MAA, Section 18, to give municipalities a right to take over an authority but held the right was "limited to the contracting municipalities alone." *Id.*

CWA maintains that the MAA, as amended by Act 73, precludes the seizure of CWA (or its assets) by City in two ways. First, it contends that via Section 5610(a.1), Act 73 divested City of any such preexisting authority under Section 5622(a), and second, that City cannot satisfy other statutory requirements of that provision. In interpreting the MAA, CWA emphasizes this Court's explanation that municipal authorities "are not the creatures, agents or representatives of the municipalities which organize them, but rather are independent agencies of the Commonwealth, and part of its sovereignty." *Id*. at 29 (quoting *Commonwealth v. Erie Metro. Transit Auth.*, 281 A.2d 882, 884 (Pa. 1971)). With that in mind, CWA contends that it was the General Assembly's clear intent through Act 73 to protect CWA "and the totality of constituents and jurisdictions it serves[.]" *Id*.

CWA acknowledges that Section 5622(a) "gives a municipality a limited ability, under specified conditions, to acquire a 'project' operated by an authority[.]" *Id*. at 31. However, CWA endorses Judge Wojcik's dissent below, contending that Section 5610(a.1) reorganized municipal authorities and read in tandem with Section 6522(a), results in the New Board, appointed by three municipalities, possessing the power once retained solely by City to obtain CWA's "projects." *Id*. at 32.

CWA further endorses Judge Wojcik's "legislative fiat" theory, which posits that the General Assembly effectively created through Act 73 something akin to multiple municipalities jointly organizing to form an authority pursuant to Sections 5603 and 5610. *Id*. (citing *Chester Water*, 263 A.3d at 710 (Wojcik, J., dissenting)).[7] CWA contends the

---

[7] CWA further opines that had

> the municipalities joined together to create or later maintain [CWA] under Sections 5603 and 5604(b), the MAA would have imposed important limitations on their ability to change their future relationship with [CWA] thereafter. For example, Section 5604(a) provides that "no municipality shall be permitted to withdraw from an authority after an obligation has

(continued…)

General Assembly must have intended to have "Chester County, Delaware County, and the City" collectively replace City's statutory role with respect to the CWA. *See id*. at 34 (citing 1 Pa.C.S. § 1938 ("A reference in a statute to a governmental agency, department, board, commission or other public body or to a public officer includes an entity or officer which succeeds to substantially the same functions as those performed by such public body or officer on the effective date of the statute, unless the specific language or the context of the reference in the statute clearly includes only the public body or officer on the effective date of the statute.")).  Thus, CWA maintains that references to an individual municipality in Section 5622(a), which previously meant City, must now reference the three-municipality partnership as reflected in the New Board.[8]

In any event, CWA maintains that the Commonwealth Court also overlooked that City cannot meet all the statutory preconditions of Section 5622(a).  First, CWA contends

---

been incurred by that authority."  53 Pa.C.S. § 5604(a).  There is no indication in Act 73, or anywhere else in the MAA, that the General Assembly would have intended to permit such a withdrawal from [CWA] merely because the General Assembly, and not the municipalities, joined the two Counties in the Authority.  It could not be seriously argued that an originally-incorporating municipality could seize the assets of an authority that later becomes joint by municipal (as opposed to legislative) action.  Yet a desiring municipality could, in the future, attempt such an acquisition under the same erroneous construction of Section 5622(a) endorsed by the Commonwealth Court below.

CWA Brief at 33.

[8]  CWA also cites Section 5612(a.1)(1), which provides that an authority's money "may not be used for any grant, loan or other expenditure for any purpose other than a service or project directly related to the mission or purpose of the authority… ."  53 Pa.C.S. § 5612(a.1)(1).  CWA contends that if "the General Assembly had intended to permit the City to retain unilateral rights to seize the assets of [CWA], it would most assuredly not have passed a provision precluding use of the 'money of the authority' for purposes other than [CWA]'s project."  CWA Brief at 34 n.9.

that it is not itself a "project established under this chapter by a board appointed by a municipality" because CWA, while established under the MAA in 1939, is no longer the same project established at its inception. *Id*. at 36 (quoting 53 Pa.C.S. § 5622(a)). CWA argues that its project "has evolved from providing water service at inception almost exclusively within the limits of the City to a 'facility or undertaking' primarily outside and beyond the City" and, through "expansions financed by ratepayer-backed bond issuances[,]" CWA "acquired existing systems and constructed new and significant infrastructure outside of the City." *Id*. at 36-37.

Second, CWA contends that its projects are not "of a character which" City, "has power to establish, maintain or operate" because CWA's projects are today "multi-jurisdictional, existing well beyond the City's limits" and yet "City has advanced nothing in the record (which consists exclusively of pleadings at this stage) to show that it could possibly establish, maintain, or operate such multijurisdictional projects." *Id*. at 37. Nor has it "pointed to any express delegation from the General Assembly to operate outside of its borders[.]" *Id*. (citing *Hamilton Hills Grp., LLC a Hamilton Twp. Zoning Hearing Bd.*, 4 A.3d 788, 795 (Pa. Commw. 2010) (stating "Municipalities are creations of the Commonwealth and possess no power beyond that which is expressly delegated to them")).[9]

Moreover, CWA avers that, under *Burke* and Act 73, City is not the proper authority to pass a resolution or ordinance, nor is it a municipality to which CWA's projects may be conveyed. CWA contends that the Commonwealth Court's reliance on its pre-Act 73 case law was erroneous and distinguishable. To the extent *Clearfield* stands for the proposition

---

[9] CWA contends that even if City had the power to do so, its admitted fiscal crisis means that it "cannot finance the basic services it is already legally obligated to provide to its own residents" which is "fundamentally inconsistent with the precondition in Section 5622(a) that the municipality itself directly operate or maintain the project." CWA Brief at 38.

that the incorporating municipality is the proper authority to pass a "resolution or ordinance" for purposes of Section 5622(a), CWA argues that directly conflicts with *Burke*. *Id*. at 40. Nonetheless, CWA distinguishes *Clearfield* and its progeny because those cases did not contemplate the divestment of a municipality's unilateral authority through Act 73, nor circumstances where "multiple co-equal controlling jurisdictions" sought "to acquire all projects of the authority." *Id*. at 41.

### Chester County

Chester County contends that the interplay between Sections 5622(a) and 5610(a.1) presents this Court with a matter of first impression. It emphasizes that our rules of statutory construction require that we read Section 5622(a) in pari materia with Section 5610(a.1) to avoid surplusage and absurd interpretations. Chester County Brief at 28. When read with these interpretative aids in mind, Chester County believes the General Assembly must have intended Section 5610(a.1) to create an authority "that operates as a mandatory joint authority" akin to those organized under Section 5610(a)(2). *Id*. at 29.

Chester County avers that, prior to Act 73, the MAA "contemplated only two types of authorities in Pennsylvania: (1) single authorities in which the originating municipality serves as the sole incorporator and member of the authority, 53 Pa.C.S. § 5601(a)(1); and (2) joint authorities in which either two or more municipalities agree to form an authority at its inception, or a single municipality forms an authority and later allows at least one other municipality to become a member[, *i*]*d*. §§ 5603, 5604, 5610(a)(2)." Chester County Brief at 29-30. It contends that Act 73 created a third type by legislative fiat for circumstances where "the incorporating municipality no longer is representative of the super-majority of the ratepayers[,]" and that it did so in order to divide both rights and responsibilities of "rights afforded to municipalities under the MAA" between the

"participating municipalities and the original incorporating municipality." *Id*. at 30. Chester County contends the restructured appointment of board members is significant because it is a power given to joint authority members under Section 5610(a)(2) and that by affording appointment power the counties under Section 5610(a.1), the General Assembly intended to give "the same right of equal representation" to municipalities in a mandatory joint authority as are "granted to municipalities in a joint authority." *Id*. at 31. Chester County asserts that the MAA provides "the same exact rights" to municipalities participating in one of these three types of authorities, and that the joint authority created via Section 5610(a.1) corrects an inequity under Section 5010(a)(2), whereby an incorporating municipality "can unilaterally decide to reject any other municipality's petition to join[.]" *Id*. at 32.

Chester County faults the Commonwealth Court for relying on pre Act 73 cases and also contends that the court erred by not reading Sections 5610(a.1) and 5622(a) in pari materia. It avers that the Commonwealth Court effectively rendered Section 5610(a.1) meaningless and will serve to discourage future multi-jurisdictional partnerships. *Id*. at 37.

Chester County also argues that the Commonwealth Court's ruling does not narrowly affect the mandatory joint authorities created by Section 5610(a.1) but necessarily extends to all joint authorities who will be subject to an incorporating municipality's power to unilaterally seize an authority's assets. *Id*. Chester County contends it is "impossible to believe that the Legislature silently intended to give some member municipalities of a joint authority 'incorporator-like' rights and other member municipalities none, exposing the fundamental flaw in the Majority's reading of Section 5622(a)." *Id*. at 38. Chester County contends this absurdly leads to a windfall for City even though it never funded CWA beyond its status as a ratepayer. *Id*. at 40.

Ultimately, Chester County argues it is unreasonable to "infer that the Legislature intended (1) to exclude members' rights in statutorily created joint authorities in contrast to voluntarily created joint authorities and (2) to allow a small segment of the ratepayers to reap the benefits of the authority[.]" *Id*. at 40 (citing *McNeil-PPC, Inc. v. Commonwealth*, 575 Pa. 50, 64 (Pa. 2003) (rejecting an interpretation of a statute that would lead to a windfall for the government at the expense of the taxpayer). Chester County is concerned that such a windfall will come at the expense of the 79% of ratepayers who are not represented by City, and the county dismisses Aqua's promise that it will institute a moratorium on rate increases if it acquires CWA.[10]

Chester County rejects the analogy made by Aqua—that City's relationship to CWA is akin to a parent-subsidiary corporate relationship—as flawed "because it overlooks that municipality authorities are independent agencies of the Commonwealth and not creatures, agents or representatives of the municipalities which organize them." *Id*. at 46. Nonetheless, even if the analogy were apt, Chester County avers that City no

---

[10] Chester County points to the experiences of several other municipalities that have seen significant rate increases following Aqua's takeovers of other authorities, indicating that:

> Since 2016, Aqua has agreed to buy eight wastewater systems in the Philadelphia suburbs for $295 million: New Garden Township, Limerick, East Bradford, Cheltenham, East Norriton, Lower Makefield, Willistown, and East Whiteland.
>
> …
>
> Customers in those five towns, which generally paid low rates under municipal ownership, will experience rate shock when Aqua's new rates go into effect. Limerick Township customers will pay 82% more; East Bradford, 64%; Cheltenham, 65%; East Norriton, 57%; and New Garden, 53%.

Andrew Maykuth, Aqua Pennsylvania's rate hike: The price per flush will go up 50% as early as Thursday, THE PHILADELPHIA INQUIRER, May 17, 2022.

longer possesses a controlling interest in CWA in the wake of Act 73's restructuring of CWA's Board.

Finally, Chester County contests Aqua's arguments that Section 5610(a.1) did not create a joint authority and that neither Delaware nor Chester County took steps to form a joint authority under Section 5604. The county contends that it is "illogical to argue that a municipality served by a water or sewer authority should request to join an authority that the Legislature **has already made it a part of**." *Id*. at 47 (emphasis in original). Ultimately, Chester County believes that, just as "unanimous approval of all member municipalities is required to convey the assets of a joint authority—even where a municipality becomes a member of a joint authority long after its creation[,]" the same logic "applies with full force to the statutorily mandated joint authority created under Section 5610(a.1)." *Id*. at 48.

### Delaware County

Delaware County presents no arguments pertaining directly to the issues we accepted for review. It only argues that the Commonwealth Court's order should be upheld on alternative grounds, asserting that CWA "has no authority under the MAA to create a trust and to transfer assets to that trust" and, therefore, "the Deed of Trust is void *ab initio*." Delaware County Brief at 5-6. We did not grant allowance of appeal to determine whether CWA possesses the power to create a trust; thus, we do not consider its arguments, nor its counterstatement of the question presented.

### Aqua

Aqua defends the Commonwealth Court's opinion without exception insofar as it held that City, as the sole creator of CWA, "has the unilateral right to take back CWA, without CWA's consent as a prerequisite." Aqua Brief at 11. It further endorses the Commonwealth Court's determinations that *Burke* is not controlling authority, that the

intermediate court correctly distinguished *Burke* in *Clearfield*, and that the *Burke* Court was never asked to determine whether an authority must itself authorize its acquisition by the incorporating municipality. *Id*. at 15-17.

Aqua further contends that Act 73 did not alter City's rights under the MAA and thus "had no impact whatsoever on the City's unilateral ability to alone acquire CWA's Assets." *Id*. at 20. Aqua concedes that after Act 73, the MAA contemplates three types of authority board compositions. Regardless of the governing structure of the authority, however, Aqua maintains that the incorporating municipality for purposes of Section 5622 forever remains the same and, with it, the power to seize an authority's assets. *Id*. at 21. Aqua further contends that "it is undeniable that Act 73 did not convert CWA into a joint authority" given that Section 5610(a)(2) remained unchanged under Act 73. *Id*. Thus, Aqua believes the plain language of the MAA shows that the General Assembly did not intend to create by "legislative fiat" what Section 5610(a)(2) permits—the formation of a joint authority by consent of the participating municipalities. Instead, Aqua argues that Section 5604 of the MAA alone "provides very specific procedures for converting an authority initially incorporated by one municipality into" a joint authority and that neither county availed themselves of those procedures. *Id*. at 22-23.

Aqua contends that the General Assembly's failure to amend Sections 5622, 5610(a)(2) and 5604 in Act 73 was purposeful. *Id*. at 23. It emphasizes the absence of any text in Section 5610(a.1) changing "the nature of the ownership of such an authority board, including CWA, from a single municipality incorporator." *Id*. at 23-24 (quotation marks omitted). Thus, Aqua avers that Act 73 "left intact" City's unilateral power under Section 5622(a). Aqua concedes that joint authorities formed under Sections 5604 and 5610(a)(2) provide incorporator-like rights to late-joining municipalities, but it disputes that the same rights arose through Act 73. *Id*. at 25. It claims that CWA and Chester County

are attempting to circumvent the plain text of the statute and effectively ask us to ignore the text of Act 73 "under the pretext of pursuing its spirit." *Id*. Aqua asserts that if the General Assembly intended Act 73 to create a joint authority akin to those created via Sections 5604 and 5610(a)(2), it would have used language similar to those provisions in crafting Section 5610(a.1). *Id*.[11] It contends that the alternative is absurd because it would take away "City's long-established property right" to CWA's assets. *Id*. at 26 (citing *Appeal of Reading Co.*, 22 A.2d 906, 907 (Pa. 1941) (stating "unless the legislature by express words or necessary implication, deprives the state of one of its existing prerogatives or interests, the presumption is against such an interpretation")).

Finally, Aqua contends that any potential rate increases for ratepayers are "speculative and unsupported allegations" that, in any event, are irrelevant to the matters before this Court. *Id*. at 27.[12]

### *City*

City filed separate briefs in response to CWA and Chester County. In its brief responding to CWA, City maintains that the only matter before us is the narrow issue decided by the Commonwealth Court, that Section 5610(a.1) "did not abrogate, supersede, or otherwise alter a[n incorporating] municipality's longstanding power under Section 5622(a) … to unilaterally obtain an authority and/or its assets[.]" City Brief (to CWA) at 1 (quoting *Chester Water*, 263 A.3d at 692). City emphasizes that the intermediate court did not decide the manner or extent to which it could exercise that power. *Id*. (citing *Chester Water*, 263 A.3d at 692 n.4). City contends that CWA's

---

[11] Aqua invokes to doctrine of inclusio unius est exclusio alterius, which holds that the inclusion of one thing implies the exclusion of another.

[12] Aqua avers these accusations were specifically contested in the Trust Petition action for lack of evidentiary support, and that should its acquisition of CWA ever come to pass, the Pennsylvania Public Utility Commission would defend ratepayers from unreasonable rates. Aqua Brief at 28.

attempts to conflate questions about that power with concerns about potential rate hikes following a hypothetical sale to Aqua are well beyond the scope of the instant appeals. *Id*. at 1, 16-17.

City echoes Aqua's argument that *Burke*'s statement that an authority must approve of the incorporating municipality's attempt to obtain an authority's project is dicta. *Id*. at 19-22. It endorses the Commonwealth Court's interpretation of Section 5622(a), noting that critical to *Clearfield*'s analysis was that the word "Authorities" in the phrase "adopted by the proper Authorities" did not refer to an authority created by an incorporating municipality but instead "to the incorporating municipalities themselves." *Id*. at 23 (quoting Section 18(A) of the 1945 MAA). It maintains that the General Assembly expressed its intent to retain *Clearfield*'s interpretation when Section 18 was reenacted as Section 5622(a) in 2001. *Id*. at 26 (citing 1 Pa.C.S. § 1922(4) (permitting the presumption that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language")).

City finds further support for the *Clearfield* interpretation in Sections 5619(a)-(b) of the MAA, which provides "reciprocal unilateral rights" whereby

> an Authority can put back its operations to the incorporating municipality, without the concurrence of the municipality, so long as the Authority has paid all of its debts. … In like manner, under Section 5622(a) of the 2001 MAA, … an incorporating municipality can take back the operations of an Authority**, without the concurrence of the Authority**, so long as the municipality has assumed the payment of all of the Authority's debts. … There is no credible reason to assume that the Legislature intended to vest an Authority with the unilateral power to return its assets to the incorporating municipality, but to deprive an incorporating municipality of the same unilateral power to repossess its Authority's assets.

*Id*. at 26-27 (emphasis in original).

City further endorses the Commonwealth Court's determination that Sections 5622(a) and 5610(a.1) are "easily reconcilable" because nothing in Section 5610(a.1) explicitly alters an incorporating municipality's power under Section 5622(a). *Id*. at 27-29. It advises that "this Court has held that the 'legislative intent to effectuate a drastic change in the law is not to be inferred by mere omission and implication.'" *Id*. at 29 (quoting *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n.*, 985 A.2d 678, 693 (Pa. 2009)). City argues that the only inference to be taken from the General Assembly's silence in Section 5610(a.1) regarding Section 5622(a) is that the former had no effect on the latter.

Regarding Chester County's theory that Section 5610(a.1) creates a new type of joint authority, City observes that there is "no reference to Sections 5622(a), 5603 or 5604, or the rights accorded incorporating municipalities thereunder, in Section 5610(a.1)" and that under those provisions, non-incorporating municipalities can join "in the original incorporation[,]" as acknowledged in Judge Wojcik's dissent. City Brief (to Chester County) at 7-8 (citing *Chester Water*, 263 A.3d at 709 (Wojcik, J., dissenting)). However, City argues that no provision in the MAA grants any municipality "a say in the repossession of an authority unless they were an original incorporating municipality pursuant to Section 5603 or a later[-]joining incorporating municipality pursuant to Section 5604." *Id*. According to City, Section 5610(a.1), like Section 5610(a)(2), "is merely a board membership provision." *Id*. at 9 (distinguishing those provisions from Section 5604).

City emphasizes that Section 5610(a.1) does not 1) refer to Section 5622(a) or an incorporating municipality's right to repossess the incorporated authority; 2) refer to Sections 5603 or 5604 "or the municipality incorporator rights created pursuant thereto;" nor does it 3) explicitly confer incorporator-like rights to authority boards expanded by Section 5610(a.1). *Id*. at 10. City further observes that Section 5610(a.1) refers only to

one incorporating municipality, and notes that it "would have been a simple legislative edict" to have described the counties added to the authority's board "as later joining incorporating municipalities if the Legislature intended them to have incorporator-like rights[, b]ut such a designation is conspicuously absent." *Id*. (quotation marks omitted). Like the Commonwealth Court, City believes its interpretation is buttressed by the state of the Commonwealth Court's antecedent case law at the time General Assembly passed Act 73.

City refutes Chester County's assertion that Section 5610(a)(2) has been interpreted to require approval of all member municipalities to convey the assets of a joint authority. *Id*. at 13. It contends that both Sections 5610(a)(2) and 5610(a.1) merely establish board membership, whereas incorporator and incorporator-like rights stem only from Section 5603 and 5604. *Id*. at 14. City believes contrary interpretations rewrite "the MAA and judicially creating a *de facto* joint authority out of thin air" where it is otherwise clear that although "Chester County and Delaware County now have representatives on the board or body of [CWA] by virtue of section 5610(a.1) of the MAA, [they] are not incorporating municipalities of" CWA for purposes of Section 5622(a). *Id*. at 14 (quoting *Chester Water*, 263 A.3d at 701 n.10).

City rejects Chester County's prediction that all later-joining municipalities will be deprived of the ability to protect their ratepayers from the incorporating municipalities under the Commonwealth Court's ruling, contending that Section 5604 empowers later-joining municipalities to join in the original incorporation, a point recognized by Judge Wojcik in his dissent. *Id*. at 15 (citing *Chester Water*, 263 A.3d at 709 (Wojcik, J., dissenting)). City maintains that is "is the *raison d'etre* for Section 5604." *Id*. at 15.

City further argues that "authorities are customarily self-financing and that the right to repossess an authority under Section 5622(a) is not conditioned on the municipality

having provided financing to an authority after its incorporation[.]" *Id*. at 15-16. City maintains that it "alone controlled the CWA for 73 years" and could have repossessed the authority under Section 5622(a) during that time despite not having never financed it beyond its status as a ratepayer. *Id*. at 16. City distinguishes *City of Philadelphia v. Schweiker*, 858 A.2d 75 (Pa. 2004), because the General Assembly "has not abrogated or superseded the City's rights under Section 5622(a) or conferred incorporator-like rights on the Counties under Section 5604" as it had done to the parking authority that was at-issue in *Schweiker*. *Id*. at 17.

### CWA Reply

CWA argues that Act 73 did not merely expand CWA's board, it "reorganized and replaced" it. CWA Reply Brief at 6. CWA believes "the proper authorities" to adopt a resolution or ordinance to convey the project to City now include Chester and Delaware Counties in addition to City. *Id*. at 7 (citing *Chester Water*, 263 A.3d at 709 (Wojcik, J., dissenting)). CWA further contends that there is no principled basis upon which to distinguish between joint authorities created under Section 5604 and those mandated by Act 73 under Section 5610(a.1). *Id*. CWA maintains that Aqua and City's "concession that the project of an authority made joint pursuant to Section 5604 cannot be unilaterally acquired by the originally incorporating municipality must, without any explanation for a distinction, be taken as an acknowledgment that an authority made joint by Act 73 is subject to the same limitation." *Id*. at 8.

CWA also faults City and Aqua for failing to address the effect of Section 1938 of the Statutory Construction Act, averring that City, as the incorporating municipality, has been replaced with the tripartite organization consisting of City, Chester County, and Delaware County. *Id*. at 9. Consequently, CWA contends that City's former status under Section 5622 has been replaced by operation of Section 1938.

CWA further contests City's repeated use of the term "repossess" to describe the operation of Section 5622, suggesting such language "falsely" implies that City was at some prior time the "owner" of CWA.  CWA emphasizes that this ignores that municipal authorities are not "creatures, agents or representatives of the municipalities which organize them," but are instead "independent agencies of the Commonwealth, and part of its sovereignty."  *Id*. at 10 (quoting *Erie Metro. Transit*, 281 A.2d at 884).

### *Chester County Reply Brief*

In response to Aqua and City's briefs, Chester County argues that there is simply no distinction to be made between member municipalities because the "MAA does not create classes of membership."  Chester County Reply Brief at 4.  It contends that there are discrepancies in how members municipalities are described, referring to them inconsistently throughout the MAA as "municipalities organizing," "members," "governing municipalities," and "municipalities composing the authority."  *See, e.g.*, 53 Pa.C.S. §§ 5605(b), 5607(a), 5607(c), 5613(b).  If the General Assembly had intended to distinguish between participating municipalities generally and incorporating municipalities, Chester County argues the legislature would have provided statutory definitions for each type.  Chester County Reply Brief at 6.  Chester County contends that, without explanation,

> City and Aqua fail to designate any name to this lesser category of municipality they contend exists.  They only assign a task to them—the municipality that appoints a board member.  Contrary to their position, this same task is associated with all municipal "members" of an authority whether that membership was established through Section 5603 as the original incorporating municipality; Sections 5604 and 5610(a)(2) as a joining municipality; or Section 5610(a.1) as a statutorily joined municipality.

*Id*. at 6-7.

Chester County believes the essential purpose of Act 73 was to correct a power disparity created when an authority expands well beyond its original jurisdictional

boundaries. *Id*. at 7. However, existing municipalities in control of an authority can simply veto a municipality's attempt to join under Section 5604, as the existing board must approve any municipality seeking to join. *See* 53 Pa.C.S. § 5604(c) (providing the procedure for joining or withdrawing from an existing authority). Thus, Chester County avers that "Act 73 sought to avoid that situation or the situation where a municipality had not pursued membership despite the authority serving its constituents." *Id*. at 7-8.

Chester County contends that if incorporator-like rights arise under Section 5604 and 5610(a)(2), they must also arise under Section 5610(a.1). It argues that both "[]sections address the same exact content and provide the same corresponding rights to a municipality voluntarily joined pursuant to S[]ection 5610(a)(2) and a municipality joined by statute under S[]ection 5610(a.1)." *Id*. at 9. The county notes that the only differences between the two provisions are the lengths of board member's term and residency requirements for board members under Section 5610(a.1) that are not required under Section 5610(a)(2). Chester County further contends that under Section 5610(b), which provides additional residency requirements applicable to all board members described in Section 5610, an absurdity would exist if Section 5610(a.1) does not confer incorporator-like rights, as Section 5610(b) requires that "a majority of an authority's board members shall be citizens residing in the incorporating municipality … or incorporating municipalities of the authority." *Id*. at 13 (quoting 53 Pa.C.S. § 5610(b)). Chester County argues that if "the statutorily joined municipalities are not considered 'incorporating municipalities,' then the requirements for board composition under both [Sections] 5610(b) and 5610(a.1) make little sense." Chester County Reply Brief at 13.[13] It argues

---

[13] Because "CWA's board consists of [nine] board members[,]" if "Chester and Delaware Counties are not construed to be incorporating municipalities, then [five] of the board members would need to reside" in City. Chester County Reply Brief at 14 n.6. Yet, since (continued…)

that City and Aqua "fail to reconcile" that the legislature intended to provide representation for Chester and Delaware Counties' ratepayers on CWA's board via Section 5610(a.1), yet simultaneously required most of those authority board members to reside in City. *Id*. at 15. If, however, Chester and Delaware Counties became incorporating municipalities, or municipalities with incorporator-like rights by operation of Section 5610(a.1), there is no absurdity or conflict created by the interaction of Sections 5610(b) and 5610(a.1).

Comparing Sections 5604 and 5610(a.1), Chester County contends that the former creates a process for a joining municipality to become a member of an authority, whereas the latter supplants that process "when certain thresholds are met." *Id*. at 16.[14] Chester County maintains that no procedure is required because the MAA mandates membership under Section 5610(a.1). *Id*. Chester County also observes that like Section 5604, Section 5610(a.1) addresses "substantive terms" beyond the appointment power by reapportioning board membership and setting the length of terms of board members. *Id*. at 17.[15]

Chester County also points out that City and Aqua present inconsistent arguments regarding whether later-joining municipalities can ever obtain an incorporating

---

Act 73, "the CWA Board has not been comprised of a majority of residents of the City of Chester." *Id*. at 14.

[14] That threshold is met when a water or sewage authority, originally incorporated by a single municipality, "provides water or sewer services to residents in at least two counties and has water or sewer projects in more than two counties where the combined population of the served municipalities, excluding the incorporating municipality, is at least five times the population of the incorporating municipality[.]" 53 Pa.C.S. § 5610(a.1).

[15] Section 5604(d) requires a potential joining municipality to submit an application setting forth "all of the information required in the case of original incorporation insofar as it applies to the incoming municipality" including, inter alia, "addresses and terms of office of all the members of the board as so reapportioned or revised." 53 Pa.C.S. § 5604(d).

municipality's or incorporating municipalities' repossession rights under Section 5622. *Id*. at 18 n.9.

### *Amicus Briefs*

The Official Committee of Retired Employees of the City of Chester ("Retired City Employees") filed an amicus brief generally supporting the Commonwealth Court's determination that Section 5610(a.1) is silent as to and unaffected by the subject matter of Section 5622(a), and that the provisions do not otherwise conflict. Retired City Employees Amicus Brief at 6-7. Retired City Employees further endorse the Commonwealth Court's decision insofar as it recognized that City remains the "sole municipality that incorporated the CWA" and, thus, that it is the only municipality which can "unilaterally acquire" the assets "managed by the CWA." *Id*. at 8.

Retired City Employees assail arguments that any ownership interest in CWA or its projects were conveyed by the sale of bonds or collection of monies from ratepayers, contending they have no foundation in the statutory framework of the MAA and manifest mere policy disagreements with the General Assembly. *Id*. at 9-10. To the extent those policy disagreements are animated by ratepayers' equitable interests, Retired City Employees argue that their own equitable interests are minimized or disregarded entirely by affording "highest priority" to CWA ratepayers' low water rates. *Id*. at 12.[16]

Retired City Employees also point to downstream consequences of overturning the Commonwealth Court's decision, contending that if Act 73 "abrogated … City's property interests" in CWA's water assets, it would raise serious constitutional

---

[16] Retired City Employees assert that there is a "real human toll" on their financial interests if City "is not financially rehabilitated" by its "opportunity to monetize" CWA's assets "for fair value[.]" Retired City Employees Amicus Brief at 12.

questions.[17]  *Id*. at 13.  Retired City Employees insist that if City lost its power under Section 5622(a) to reclaim CWA's assets, then Act 73 "would be a direct cause of … City's inability to satisfy its contractual obligations to its creditors, including … City's contractual obligations to the Retirees that pre-date the 2012 Act[.]"  *Id*. at 14.

House Speaker Bryan Cutler and Representative John Lawrence ("House Amici") jointly filed an amicus brief.  Both legislators "cast affirmative votes in favor of" Act 73 "and serve constituent interests materially impacted by the matter."  House Amici Brief at 1.  House Amici note that the Octoraro Reservoir, a major source of CWA's water, "is sited in Amici's Legislative Districts and Representative Lawrence represents" CWA ratepayers.  *Id*.  They argue that in amending Section 5610 by adding Section 5610(a.1), "the General Assembly voted unanimously to replace the boards of water authorities that provide services to residents in more than two counties," and intended "to ensure that ratepayers residing outside of the incorporating municipality had a representative voice on the governing body of the authority from which they receive services, including as to conveyances of the authority under Section 5622 of the MAA."  *Id*. at 1-2.  House Amici believe the Commonwealth Court's decision "contravenes this legislative intent."  *Id*. at 2.

First, House Amici contend that Section 5622(a) does not permit City to unilaterally convey CWA assets to itself, arguing that Section 5622(a) governs conveyances of established projects by municipal authorities, including those authorities "reconstituted by Section 5610(a.1)."  *Id*. at 10.  House Amici argue that when Section 5602's definitions are incorporated into the text of Section 5622(a), keeping in mind that "reconstituted

---

[17]  In particular, Retired City Employees cite the Contracts Clauses of the Constitutions of the United States and Pennsylvania, respectively.  U.S. CONST. art I, § 10; PA. CONST. art. I, § 17.  They argue that the legislature cannot abridge City's rights under a prior contract.  *Id*. (citing *First Nat'l Bank of Pa. v. Flanagan*, 528 A.2d 134, 137 (Pa. 1987); *Beaver Cnty. Bldg. & Loan Ass'n v. Winowich*, 187 A. 481, 485 (Pa. 1936)).

boards are comprised of appointments by municipalities (plural)," Section 5622(a) reads as follows:

> If a **"structure, facility or undertaking"** established under this chapter by "**the governing body of a municipal authority**" appointed by *municipalities* is of a character which the *municipalities* ha[ve] power to establish, maintain or operate and the municipalities desire[] to acquire the **"structure, facility or undertaking," "the municipalities referred to above"** may by appropriate resolution or ordinance adopted by "**the municipalities referred to above**" signify its/their desire to do so, and the **"municipal authority"** shall convey by appropriate instrument the **"structure, facility or undertaking"** to the *municipalities* upon the assumption by the *municipalities* of all the obligations incurred by the **"municipal authority"** with respect to that project.

*Id*. at 12 (House Amici's substitutions into Section 5622(a) in bold).

As such, House Amici contend that "the plain language of Section 5622 requires that the municipality or municipalities that appoint the governing body of the … authority adopt resolutions to effectuate a conveyance under Section 5622." *Id*. (emphasis omitted). By contrast, the Commonwealth Court's decision allows City "to unilaterally take possession of the CWA's assets, without approval from the municipalities that appoint the governing body of the CWA as reconstituted pursuant to Section 5610(a.1)." *Id*. at 13. House Amici argue that this "inequity is precisely what the General Assembly intended to prevent" through Act 73. *Id*. According to House Amici, the "critical question presented by the City's proposed conveyance" is not whether CWA must approve of a transfer under Section 5622(a) "as the Commonwealth Court myopically viewed the matter" but, instead, whether "City can unilaterally do so without the approval of Delaware and Chester Counties following the reconstitution of … CWA['s] board as required by Section 5610(a.1)." *Id*. at 14.

House Amici "do not dispute" the intermediate court's analysis in *Clearfield, Forward, Forks, and Salem*. *Id*. House Amici contend instead that in each of those cases,

> the "project" that the municipality sought to acquire was established by the governing body of an authority that was "appointed" solely by the municipality that sought to acquire the "project." Thus, the issue in those cases was whether the municipality that appointed the [authority's] board … could acquire the project without the consent **of the authority itself**.

*Id*. (emphasis in original).

However, following the addition of Section 5610(a.1) to the MAA in 2012, House Amici contend that the project that "City seeks to acquire[,]" i.e., CWA's water system and assets, "was established by" the New Board, which "is appointed by three municipalities (the City, Delaware County, and Chester County)." *Id*. at 15 (emphasis omitted). Thus, House Amici contend that *Clearfield* and its progeny remain good law but are distinguishable because they all involved a governing board appointed solely by the incorporating municipality. *Id*.

House Amici assert that the Commonwealth Court's decision violated "several principles of statutory interpretation." *Id*. Of particular note, they contend that the intermediate court interpreted Section 5622(a) as pertaining exclusively to the municipality that 'created' or 'incorporated' the … authority, but that no such language appears in Section 5622(a), which instead speaks of an authority's board that is "appointed by a municipality." *Id*. at 16 (quoting 53 Pa.C.S. § 5622(a)). House Amici argue that "the Commonwealth Court erred in re-writing the plain text of Section 5622 to insert the words 'created or incorporated' when those words do not appear on the face of Section 5622 itself." *Id*. at 17. House Amici observe that in neighboring provisions, the MAA utilizes terms that clearly identify an incorporating municipality with specificity. *Id*. at 17-18 (citing 53 Pa.C.S. § 5619(a) (allowing an authority to convey a project "to the municipality **creating the authority**") (emphasis added); 53 Pa.C.S. § 5619(c) (requiring

an authority to submit information "to the municipality **which created it**") (emphasis added); 53 Pa.C.S. § 5613 (requiring certain actions be approved by the governing body of the "municipality **which created** … the authority") (emphasis added)). House Amici contend that if "the General Assembly intended Section 5622[(a)] to grant the unilateral authority to convey an authority to the municipality that 'created' it (as the Commonwealth Court found), it would have used those words in Section 5622, just like it did in Sections 5613, 5619(a), and 5619(c)." House Amici Brief at 18. House Amici fault the Commonwealth Court for failing to give purpose and effect to this "intentional distinction." *Id*. (citing *In re Consol. Appeals of Chester-Upland Sch. Dist.,* 238 A.3d 1213, 1222 (Pa. 2020) ("[W]here the Legislature includes specific language in one section of a statute, its omission from a similar section often reflects a different legislative intent, and hence, it should not be implied where excluded."); *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.")).

House Amici also contend that the "practical consequences" of the Commonwealth Court's decision are "untenable[,]" noting the concerns of CWA's ratepayers and the numerous other municipalities it serves if City is permitted to unilaterally seize CWA's assets. *Id*. at 20. House Amici believes this renders the intermediate court's interpretation unreasonable as a matter of law. *Id*. (citing 1 Pa.C.S. § 1922(1)).

House Amici do not contest the Commonwealth Court's treatment of *Burke*, agreeing that the *Burke* Court was not asked to consider whether an authority must consent to a conveyance under the prior version of Section 5622(a). *Id*. at 21-23.

**Analysis**

In matters involving statutory interpretation, our standard of review is de novo, and we apply a plenary scope of review. *Steets v. Celebration Fireworks, Inc.*, 335 A.3d 1076, 1089 (Pa. 2025). We focus on the text of a statute to ascertain its purpose and meaning, as it is the best available evidence of the General Assembly's intent. *Id.*; *see also Commonwealth v. Spence*, 91 A.3d 44, 46, (Pa. 2014) ("Generally, the best indication of the General Assembly's intent may be found in the plain language of the statute."). When clear and unambiguous, our rules of construction forbid circumvention of the text "under the pretext of pursuing its spirit." *Steets*, 335 at 1089 (quoting 1 Pa.C.S. § 1921(b)).

In ascertaining legislative intent, the words of a statute must be read with an understating of the context in which they appear, as this Court "does not dissect statutory text and interpret it in a vacuum." *Commonwealth v. Kingston*, 143 A.3d 917, 924 (Pa. 2016). Thus, we ascertain the meaning of words both within their immediate context and with due consideration of their place in the overall statutory scheme, which at times may narrow the plain meaning of a term that may carry varied meanings outside of those contexts. *See A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016). Thus, although a dictionary definition may be adequate for most interpretative tasks, we must be mindful that in "law as in life, … the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015).

The General Assembly has provided a variety of rules of construction to aid our interpretation of statutory text in such circumstances. *See* 1 Pa.C.S. §§ 1903 (stating that words and phrases typically assume their common meaning, but that "technical words and phrases" are afforded their "peculiar and appropriate meaning or definition"); 1922(a)(1) (directing that when ascertaining legislative intent, we assume the General Assembly does not intend absurd and/or unreasonable results); 1922(a)(2) (requiring that

statutory text be read to give effect to all its provisions); 1932 (requiring statutes on related matters to be read in pari materia). Also relevant here is that, unless otherwise specified, we are obliged to read statutory text with the assumption that "[t]he singular shall include the plural, and the plural, the singular." 1 Pa.C.S. § 1902. Additionally, "[w]ords used in the past or present tense shall include the future." *Id.*[18]

Of primary concern to us in this appeal is the function and meaning of Section 5622(a), the operation of which exists as the predicate to all questions we accepted for review. In the broadest sense, Section 5622(a) plainly permits the conveyance of an authority's projects from an authority to a municipality, but we cannot begin to determine Section 5610(a.1)'s ostensible impact on Section 5622(a) without first understanding more specifically how, and under what conditions, Section 5622(a) operates. Although the Commonwealth Court has a long history of interpreting Section 5622(a), this Court has yet to address it in any meaningful detail (and not at all since the passage of Act 73). Thus, our interpretation of Section 5622(a) is a matter of first impression[19] and "we are not bound by Commonwealth Court decisions" that have interpreted it. *Woodford v. Ins. Dept.*, 243 A.3d 60, 71 n.9 (Pa. 2020).

### *Section 5622(a)*

We will first address the meaning of Section 5622(a) of the MAA. In its proper context, Section 5622(a) provides as follows:

> **§ 5622. Conveyance by authorities to municipalities or school districts of established projects**
>
> **(a) Project.--**If a project established under this chapter by a board appointed by a municipality is of a character which the municipality has power to establish, maintain or operate and

---

[18] Notably, Section 1902 does not direct us to read the past tense to include the present, or the present tense to include the past.

[19] As discussed below, *Burke* only addressed the pertinent statutory text in dicta.

the municipality desires to acquire the project, it may by appropriate resolution or ordinance adopted by the proper authorities signify its desire to do so, and the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project.

\*     \*     \*

**(d) Reserves.--**Following transfer of a project pursuant to this section, the municipality, including an incorporated town or home rule municipality, which has acquired the project shall retain the reserves received from the authority which have been derived from operations in a separate fund, and the reserves shall only be used for the purposes of operating, maintaining, repairing, improving and extending the project. Money received from the authority which represents the proceeds of financing shall be retained by the municipality in a separate fund which shall only be used for improving or extending the project or other capital purposes related to it.

53 Pa.C.S. § 5622(a), (d).

Section 5622(a) cannot be read in isolation. The topic of Section 5622 is the conveyance of established projects from authorities to municipalities. It does not directly speak to the conveyances of authorities themselves.[20] It also does not utilize any language signifying ownership of authorities by municipalities. Nor could it; this Court has long recognized that authorities are "independent agencies of the Commonwealth" and not the "creatures, agents or representatives" of municipalities. *Erie Metro. Transit*, 281 A.2d at 884 (quoting *Whitemarsh Twp. Auth. v. Elwert*, 196 A.2d 843 (Pa. 1964)). Consequently, we firmly reject arguments suggesting directly or by analogy that City has

---

[20] The termination of authorities is addressed elsewhere in the MAA. *See* 53 Pa.C.S. § 5619.

vested property rights associated with its relationship to CWA. Under Section 5622(a), City either has, or does not have, the power to force the conveyance of CWA's projects.[21]

Certain terms contained within Section 5622(a) are defined in Section 5602. A "project" is defined as:

> Equipment leased by an authority to the municipality or municipalities that organized it or to any municipality or school district located wholly or partially within the boundaries of the municipality or municipalities that organized it, or any structure, facility or undertaking which an authority is authorized to acquire, construct, finance, improve, maintain or operate, or provide financing for insurance reserves under the provisions of this chapter, or any working capital which an authority is authorized to finance under the provisions of this chapter.

53 Pa.C.S. § 5602. Pertinent here, the structures, facilities, undertakings, or working capital that constitute projects are cabined by additional language contained in that definition. *See id.* A "project" is limited to that which "an authority **is** authorized to acquire, construct, finance, improve, maintain or operate, or provide financing for[.]" *Id*. (emphasis added). This is phrased in the present tense, i.e., a project is something a presently existing authority is authorized to "acquire, construct, finance," etc. *Id*.

Section 5602 also defines an "Authority" as a "body politic and corporate created under" the current MAA, the 1945 MAA, or the 1935 MAA. *Id*. A "Board" is the "governing body of an authority." *Id*. A "Municipal authority" is the "body or board authorized by law to enact ordinances or adopt resolutions for the particular municipality." *Id*. A "Municipality" is a "county, city, town, borough, township or school district of the Commonwealth." *Id*.

---

[21] Even when a municipality is empowered to force the conveyance of an authority's projects, significant limitations are placed upon the municipality's use of the assets associated with those projects. *See* 53 Pa.C.S. § 5622(d). Such limitations are incongruent with ownership.

Consistent with these definitions, an authority is not itself a project, nor is it simply the sum of the projects it controls. An authority is itself a "body politic and corporate[.]" 53 Pa.C.S. § 5602. Again, it is an agency of the Commonwealth and a creature of statute, not an organ or subsidiary of associated municipalities or an individual municipality that facilitated its existence at incorporation. *Erie Metro. Transit*, 281 A.2d at 884.

With these definitions in mind, we can begin to understand how Section 5622(a) operates. The first part of Section 5622(a) describes the projects that may be conveyed by operation of Section 5622(a). It begins: "If a project established under this chapter by a board appointed by a municipality is of a character which the municipality has power to establish, maintain or operate[.]" 53 Pa.C.S. § 5622(a). For ease of disposition, we refer to this as the "project-defining clause" of Section 5622(a).

There is no dispute that CWA's projects were originally established by a board appointed by a municipality, that is, by the Old Board. But some of CWA's projects were established by CWA as governed by the New Board. Read alone, this clause suggests that not all projects managed by an authority are interchangeable for purposes conveyances under Section 5622(a), otherwise the General Assembly could have written far less and simply begun Section 5622(a) with 'if the municipality desires to acquire the project… .' Thus, the legislative effort to describe a project subject to a Section 5622(a) conveyance is our first clue that not all projects are conveyable in all circumstances. Also notable in the project-defining clause is that it does not directly refer to the municipality that incorporated or created the authority. What this all means is made clear in the following portion of the project-defining clause.

The project-defining clause further cabins an eligible project as one that "is of a character which the municipality has power to establish, maintain or operate and the municipality desires to acquire the project[.]" 53 Pa.C.S. § 5622(a). This phrase is again

describing the project, now phrased in the present tense, as contrasted with the past tense ("established") used earlier in first part of the project-defining clause. We must assume this tense change is meaningful and, indeed, it explains that a project previously "established" in the past is distinguishable from a project that "**is** of a character which the municipality has power to **establish**, **maintain** or **operate**" in the present. 53 Pa.C.S. § 5622(a) (emphasis added). This phrase would be redundant if it referred to every project established by an authority since it was originally incorporated.

Indeed, the General Assembly could have further simplified the language of Section 5622(a) to accommodate the Commonwealth Court's interpretation that construes Section 5622(a) as only referring to an incorporating municipality. However, Section 1922(a)(2) of our rules of statutory construction dictates that we must give meaning to both this additional language cabining the types of projects affected and to the change in tense as intentional acts by the General Assembly. Here, the General Assembly chose not to use terms used elsewhere in the MAA to refer solely to an incorporating or creating municipality. *See, e.g.*, 53 Pa.C.S. §§ 5613(b)(1) (referencing "the municipality which created … the authority"); 5613(b)(2) (same); 5619(a) (concerning "the municipality creating the authority"); 5619(c) ("An authority requesting to terminate its existence must submit a certificate requesting termination to the municipality which created it."). The General Assembly also used the term "incorporating municipality" several times in Section 5610 in relation to the composition of authority boards. *See* 52 Pa.C.S. §§ 5610(a), (a.1), (b). Thus, Section 5622(a) cannot be read to be exclusively referring to creating or incorporating municipalities. Had the General Assembly intended such a narrow meaning, it would have used the language employed throughout the MAA to describe creating and incorporating municipalities. That is not to say that some incorporating municipalities cannot meet the conditions required to force a conveyance

under Section 5622(a), as is illustrated in the Commonwealth Court's case law.  But it necessarily means that Section 5622(a) is not describing a power exclusively held by them.

The definition of "project" further illuminates the meaning and operation of the project-defining clause.  A project is defined in the present tense as a "structure, facility or undertaking" that an authority "is" authorized to "acquire, construct, finance, improve, maintain or operate, or provide financing for[.]"  53 Pa.C.S. § 5602.  This temporal tense is important because it refers to projects as they are presently governed by a currently-constituted authority.  A project as it exists today may be a structure, facility, or undertaking established under a previous board of the authority, but the statutory definition of project refers only to such property that an authority is authorized to "acquire, construct, finance, improve, maintain or operate, or provide financing for" today.  *Id*.  The definition of project therefore dovetails with the shift in tense made in the text of Section 5622(a) discussed above.  Consequently, Section 5622(a) only permits a conveyance of a project to a municipality (or municipalities) that today controls the authority.

The second part of Section 5622(a) states that "**it** may by appropriate resolution or ordinance adopted **by the proper authorities** signify its desire to do so, and the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project."  53 Pa.C.S. § 5622(a) (emphasis added).  We refer to this for ease of disposition as the "conveyance clause," as it describes who is empowered to convey a project defined under the project-defining clause, and how the conveyance is effectuated.  The conveyance clause can be confusing on first blush, but the context in

which it appears, coupled with our well-worn rules of statutory construction, clearly dictates what "it," "property authorities," "authorities," and "municipalities" mean.

The "it" at the beginning of the conveyance clause must refer to "the municipality" (or municipalities, *see* 1 Pa.C.S. § 1902) that presently has the "power to establish, maintain or operate" the targeted project as dictated by the preceding project-defining clause. *Id*. Thus, "by the proper authorities" must refer to the governing authorities of the municipality or municipalities.[22] No other construction makes sense.[23] The next time the conveyance clause uses the term "authorities" in the phrase "the authorities shall convey," it must be referring to an authority (e.g., the CWA), as distinct from the "proper authorities," the latter of which must be referencing the governing bodies of the municipality (or municipalities) that seek to effectuate the conveyance of a project (i.e., the Municipal authority or Municipal authorities). The qualifier "proper" may be doing double duty in the conveyance clause, both distinguishing it from the immediately subsequent use of the term "authorities," and to signify that the municipality (or municipalities) that may effectuate a conveyance may change over the life of a project.

Through the interaction of these two clauses, it becomes clear that the municipality (or municipalities) that may force the conveyance of an authority project are not set in stone for all time under Section 5622(a) after projects are established. Section 5622(a) anticipates changes in how an authority is presently governed and accommodates such

---

[22] Although perhaps confusing at first glance, the MAA refers to the governing body of a municipality as a "Municipal authority." 53 Pa.C.S. § 5602. "Municipal authority" is defined as: "The body or board authorized by law **to enact ordinances or adopt resolutions** for the particular municipality." *Id*. (emphasis added). This language tracks with the language in Section 5622(a). *See* 53 Pa.C.S. § 5622(a) (stating "it may by appropriate resolution or ordinance adopted by the proper authorities signify").

[23] This is where *Burke*'s dicta erred, as discussed below. *See* infra pp. 47-50.

changes through its plain text.  We note that Section 5622(a)'s flexibility predates Act 73, and its language has remained mostly unchanged for the better part of a century.

*Section 5610(a.1)*

There is little dispute in this case as to what Section 5610(a.1) accomplished generally, as the bulk of the dispute is how it interacts (if at all) with Section 5622(a). Section 5610 provides, in pertinent part:

**§ 5610. Governing body**

**(a) Board.--**Except as set forth in subsection (a.1), the powers of each authority shall be exercised by a board composed as follows:

(1) If the authority is incorporated by one municipality, the board shall consist of a number of members, not less than five, as enumerated in the articles of incorporation. The governing body of the municipality shall appoint the members of the board, whose terms of office shall commence on the effective date of their appointment. One member shall serve for one year, one for two years, one for three years, one for four years and one for five years commencing with the first Monday in January next succeeding the date of incorporation or amendment. If there are more than five members of the board, their terms shall be staggered in a similar manner for terms of one to five years from the first Monday in January next succeeding. Thereafter, whenever a vacancy has occurred by reason of the expiration of the term of any member, the governing body shall appoint a member of the board for a term of five years from the date of expiration of the prior term to succeed the member whose term has expired.

(2) If the authority is incorporated by two or more municipalities, the board shall consist of a number of members at least equal to the number of municipalities incorporating the authority, but in no event less than five. When

one or more additional municipalities join an existing authority, each of the joining municipalities shall have similar membership on the board as the municipalities then members of the authority and the joining municipalities may determine by appropriate resolutions. The members of the board of a joint authority shall each be appointed by the governing body of the incorporating or joining municipality he represents, and their terms of office shall commence on the effective date of their appointment. One member shall serve for one year, one for two years, one for three years, one for four years and one for five years from the first Monday in January next succeeding the date of incorporation, amendment or joinder, and if there are more than five members of the board, their terms shall be staggered in a similar manner for terms of from one to five years commencing with the first Monday in January next succeeding. Thereafter, whenever a vacancy has occurred by reason of the expiration of the term of any member, the governing body of the municipality which has the power of appointment shall appoint a member of the board for a term of five years from the date of expiration of the prior term.

**(a.1) Water authorities and sewer authorities.--**If a water or sewer authority incorporated by one municipality provides water or sewer services to residents in at least two counties and has water or sewer projects in more than two counties where the combined population of the served municipalities, excluding the incorporating municipality, is at least five times the population of the incorporating municipality, all of the following apply:

(1) Ninety days after the effective date of this subsection, the governing body in existence on the effective date of this subsection shall be replaced by a governing body comprised of the following:

(i) Three members appointed by the governing body from each county in which the services to

residents are provided. A member under this subparagraph must reside in a town, township or borough, which receives services from the authority.

(ii) Three members appointed by the governing body of the incorporating municipality.

(2) A member serving under paragraph (1) shall serve for a term of five years.

\* \* \*

**(g) Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

"Water or sewer authority." An authority incorporated by a city of the third class, a borough, a town or a township to provide water or sewer services.

"Water or sewer project." Any pumping station, filtering plant, impoundment facility, dam, spillway or reservoir.

53 Pa.C.S. § 5610.

Section 5610(a) dictates the composition of an authority's board in general cases. Section 5610(a)(1) applies to boards incorporated by one incorporating municipality, and Section 5610(a)(2) applies to boards incorporated by more than one incorporating municipality or boards consisting of both incorporating municipalities and joining municipalities. Section 5610(a)(1) requires a minimum of five board members to be appointed by the sole incorporating municipality, sets staggered terms of board members, and addresses the appointment of new board members when vacancies arise due to the expiration of a board member's term. 53 Pa.C.S. § 5610(a)(1). Section 5610(a)(2) also sets a floor of five board members, but it requires even more when there are more than five participating municipalities. 53 Pa.C.S. § 5610(a)(2). Section 5610(a)(2) dictates how the board is composed and ensures that joining municipalities are entitled to "similar

membership" as the preexisting and joining municipalities "may determine by appropriate resolutions." *Id*. Otherwise, the terms of board members and rules for replacing vacancies due to term expiration are similar to those set forth in Section 5610(a)(1).

Act 73 added Section 5610(a.1) in 2012, creating a narrow exception to Section 5610(a). First, Section 5610(a.1) applies only to water and sewage authorities that have expanded to provide services to residents in at least two counties. 53 Pa.C.S. § 5610(a.1). Furthermore, for the exception to apply, the authority must have water or sewage projects in at least two counties. *Id*. Moreover, Section 5610(a.1)'s effect is exceptionally narrow as it only applies "where the combined population of the served municipalities, excluding the incorporating municipality, is at least five times the population of the incorporating municipality." *Id*. If all these conditions are satisfied, Section 5610(a.1) requires replacement of the authority's board within ninety days of the effective date of Act 73. *Id*. § 5610(a.1)(1).[24] At that time, "the governing body" of the existing authority is replaced by a "governing body" defined in Section 5610(a.1)(i)-(ii). There is no dispute in this case that Act 73 applied to CWA and, accordingly, the New Board replaced the Old Board by operation of Section 5610(a.1).

Having described the basic meaning and function of Sections 5622(a), 5610(a.1), and related definitions, we now turn to answer the questions before us today. Chester County and CWA present somewhat similar claims concerning whether City can unilaterally force the conveyance of projects under Section 5622(a) in the wake of Act 73's introduction of Section 5610(a.1). We will address those claims together. But, first, we must address CWA's claim that both questions are controlled by *Burke*.

### *Burke*

---

[24] Act 73 became effective on August 27, 2012.

CWA maintains that *Burke* controls the questions before us insofar as it ostensibly determined that any Section 5622(a) conveyance must be approved by that authority's board. Indeed, *Burke* stated repeatedly that the "proper authorities" in the conveyance provision refers to an authority's board. But those statements were dicta.

*Burke* was decided in 1957 under the language of Section 18(A) of the 1945 MAA, which remains virtually unchanged under Section 5622(a). Burke was an engineer under contract with the North Huntingdon Township Municipal Authority, working on the expansion of the township authority's waterworks, for which Burke expected to be paid six percent of the total cost of the project. *Burke*, 136 A.2d at 312. Two years later, the township authority sold its waterworks to the Municipal Authority of Westmoreland County, and the township was itself a signatory to the contract. *Id*. Seeking unpaid fees for services rendered, Burke filed an assumpsit action, joining as defendants the township authority, the township, and the county authority. Pertinent here, one of Burke's theories of relief with respect to the township was that the township "became liable to Burke by virtue of the provisions of [Section 18(A)] providing for the assumption of an Authority's projects by the municipality which created it[.]" *Id*. That is, Burke argued that by "signing the contract of May 28, 1956," the township "**in effect** acquired the water[]works under this statute and therefore assumed" the township authority's debts related to the waterworks project. *Burke*, 136 A.2d at 313 (emphasis added). The trial court sustained the township's preliminary objection for Burke's failure to state a cause of action and struck the township from Burke's complaint. *Id*. at 312-13.

The question this Court considered in *Burke* was whether the lower court had erred in determining that the township had not been properly joined in the assumpsit action; that is, whether Burke had instead established that the township had become liable for his fees and expenses when the waterworks was transferred to the county authority by

the contract. Ultimately, this Court determined that there was never an "acquisition of any project of the [township a]uthority" by the township under Section 18(A).[25]

The *Burke* Court determined that no Section 18(A) conveyance had occurred, in part, because the township authority had never adopted a resolution under Section 18(A). *Id*. at 314 (stating that because no "resolution or ordinance" had "ever been adopted by" the [township a]uthority there could be no acquisition of any project of the [township a]uthority by" North Huntingdon Township). However, this aspect of the *Burke* decision was dicta.

First, the question before the Court in *Burke* was not whether an authority was required to issue a resolution or ordinance to facilitate a Section 18(A) conveyance. Burke argued that, as a party to the contract, the township had "in effect" conveyed the waterworks to itself via Section 18(A). *Id*. at 313. Second, the *Burke* Court cited the lack of a resolution or ordinance by the authority as evidence that no actual Section 18(A) conveyance had occurred. Burke's claim was premised on the notion that such a transfer must have occurred to facilitate the sale of the project from the township authority to the county authority.[26] However, the holding in *Burke* was the answer to Burke's specific claim that the contract had somehow necessitated or implied a Section 18(A) transfer from the township authority to the township. In that respect, this Court ultimately concluded that no such inference flowed from the contract:

> The Township's execution of the agreement between the [t]ownship [a]uthority and the [c]ounty [a]uthority was simply a waiver by the municipality of its rights to acquire the project

---

[25] This Court also rejected Burke's alternative theory for relief that he was a third-party "creditor beneficiary" to the contract. *Burke*, 136 A.2d at 315.

[26] There is no indication that Burke had claimed that the 1945 MAA did not permit such a sale in the absence of a preceding Section 18(A) conveyance. The scant discussion of specific arguments in *Burke* only permits us to infer that he had argued that a Section 18(A) conveyance was inferred because the township had signed the sale contract.

> from the [a]uthority and there was no statutory assumption by the municipality of any of the obligations incurred by the [township a]uthority in respect to its project. **In this respect** Burke has failed to state a valid cause of action against the Township.

*Id*. at 314 (emphasis added).

*Burke* decided only whether the township had been properly joined in the assumpsit action, which turned on whether Burke had stated a valid cause of action against the township. *Burke* was not deciding, and did not purport to hold, that an authority must approve of a Section 18(A) transfer, although it certainly opined on that subject. To the contrary, *Burke* specifically held that the township had only waived its rights to acquire the waterworks under the contract, and, thus, that the township had never assumed the township authority's debts associated with the waterworks by operation of Section 18(A). *Id*. Thus, *Burke* is not controlling law on whether an authority must approve a Section 18(A) conveyance.

Moreover, *Burke*'s dicta is not persuasive. *Burke*'s assumption about an authority's statutory role in a Section 18(A) conveyance was internally inconsistent and contrary to our plain reading of Section 18(A)'s nearly identical successor, Section 5622(a), which plainly commands that it is an authority's participating municipalities that must adopt a resolution or ordinance to effectuate a conveyance under Section 5622(a).[27] *Burke*'s dicta was internally inconsistent because it referenced a municipality's "rights" to acquire a project. *Id*. Requiring an authority's permission to convey an authority's project is inconsistent with a municipality's ostensible right to acquire it.

We agree with *Clearfield*'s rejection of *Burke*'s dicta. *Burke*'s examination of Section 18(A) was brief and largely relied on case law that did not interpret the statutory text. *Id*. at 313. After quoting the statute, but without performing any statutory analysis,

---

[27] This was the same result reached by the Commonwealth Court in *Clearfield*.

*Burke* stated that Section 18(A) "outlines the method to be pursued where a municipality—the Authority's creator—desires to acquire a project of the Authority; it must be accomplished by an appropriate resolution or ordinance adopted by the Authority." *Id*. As best we can discern, *Burke* conflated an "authority" with the reference in Section 18(A) to "proper authorities" who must adopt a resolution or ordinance to initiate a conveyance.[28] As we discussed above, the "proper authorities" are the governing bodies of municipalities, and necessarily so pursuant to the unambiguous statutory text. Although we disagree with its initial statutory analysis insofar as it deemed Section 18(A) ambiguous,[29] *Clearfield* resolved that supposed ambiguity to reach the same result, wisely observing that

> the words, 'it or they' are pronouns referring back to the nearest nouns preceding them, which are 'municipality or municipalities[.'] The next words 'adopted by the proper Authorities' being a part of the same phrase must also refer to those governmental bodies which can pass the resolution or ordinance. This analysis is further aided by the next phrase, 'signify Its or Their desire to do so[,'] for here the only party (or parties) whose desire sets in motion this process is the municipality or municipalities.

*Clearfield*, 285 A.2d at 534.[30]

---

[28] This mistake can be observed in the opinion itself, as *Burke* first quoted the whole provision correctly, *see Burke*, 136 A.2d at 313 (stating "resolution or ordinance adopted by the proper Authorities"), and then, just three paragraphs later, it misquoted Section 18(A), substituting "Authority" for "proper Authorities," *see id.* at 314. There is no analysis in *Burke* explaining why "proper Authorities" refers to an authority rather than to the authorities that govern the municipality or municipalities that seek to acquire a project.

[29] *Clearfield* baldly declared that it was ambiguous without expressing any specific reason for that determination. Although awkwardly worded, we do not find Section 18(A) (or as it now exists, Section 5622(a)) to be ambiguous with respect to the fact that "proper Authorities" cannot refer to the authority whose project is the target of a conveyance. Within the context of the statute, and more specifically within the grammatical context of the sentence in which it appears, "proper Authorities" cannot be referring to an authority.

[30] The phrases "or municipalities," "or they," and "or Their" no longer appear in this sentence, as they were removed in the 2001 recodification of the statute as Section (continued…)

Thus, we conclude that *Burke* is not controlling precedent as to whether a municipality or an authority initiates a Section 5622(a) conveyance. Not only was *Burke*'s discussion of the matter dicta, its interpretation of Section 18(A) was incorrect because the plain language of Section 18(A) cannot support that conclusion. As Section 5622(a) is functionally identical to its predecessor in Section 18(A), we hold likewise that an authority does not itself play a role in the decision to initiate a Section 5622(a) conveyance. The intermediate court's reliance on *Clearfield* led it to the same conclusion and, therefore, it did not err in that regard. However, we today correct *Clearfield* and its progeny to the extent that they found ambiguous the text of Section 18(A), and by implication, Section 5622(a).

Is City the Only Municipality That Can Force a 5622(a) Conveyance?

The remaining two questions for our review are not identical, but they do present both sides of the same coin. CWA asks whether City has the unilateral power as CWA's incorporating municipality to force a Section 5622(a) conveyance of CWA's projects despite the addition of Section 5610(a.1) to the MAA via Act 73. Chester County essentially asks whether Delaware County and Chester County are now equal partners with City in wielding that conveyance power in the wake of Section 5610(a.1). Because they are interrelated and involve the same statutory language, we will address these issues together.

There is no dispute that City was once the only municipality that could have invoked Section 5622(a) (or its predecessor, Section 18(A)) to acquire CWA's projects. City incorporated CWA at its inception and CWA's projects were established in its earliest days "by a board appointed by a municipality," as the Old Board by necessity established

_____

5622(a). Those changes do not affect our interpretation, as the removed language had been rendered superfluous by 1 Pa.C.S. § 1902, which directs that the singular shall include the plural.

some of CWA's projects, and the Old Board was exclusively appointed by City. Thus, such projects were at one time "of a character which the municipality" had "the power to establish, maintain or operate[.]" 53 Pa.C.S. § 5622(a).

However, Section 5622(a) is not static by its plain terms and it did not empower City to retain its conveyance power in perpetuity. Section 5622(a) does not reference an "incorporating" municipality nor municipalities "creating" the targeted authority. In this regard, we must adhere carefully to what Section 5622(a) does not say. *Commonwealth v. Wright*, 14 A.3d 798, 814 (Pa. 2011) ("As a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say.") (internal brackets and citation omitted). We are not entitled to add by interpretation what the General Assembly saw fit to purposefully exclude. *Id*.

As detailed above, the MAA often references incorporating municipalities and, at times, it references municipalities that created an authority. But no such terms are found in Section 5622(a), which only refers more generally to a "municipality" (which we assume includes the plural) and "proper authorities" which, as established above, necessarily refers to the governing bodies of the municipality (or municipalities) that seek to acquire an authority's project. We must assume the omission of the terms "incorporating" and "creating" to describe municipalities mentioned in Section 5622(a) was intentional, necessitating that we afford it some effect. Thus, by its plain terms—and long before Act 73 added Section 5610(a.1) to the MAA—Section 5622(a) did not provide City with perpetual and unilateral power under Section 5622(a) to force the conveyance of CWA's projects.

In determining that City retained this power after Act 73, the Commonwealth Court relied heavily on its decisions in *Clearfield*, *Forward Twp.,* and *Twp. of Forks*. However,

we conclude that those decisions do not conflict with our conclusion today that City does not retain such power in perpetuity. In each of those cases, there was only one municipality—the incorporating municipality—at issue. In each case, the incorporating municipality created the authority targeted under Section 18(A) and later sought to acquire the same authority's projects. Thus, the Commonwealth Court erred in relying on *Clearfield*, *Forward Twp.,* and *Twp. of Forks* to conclude that City retained its Section 18(A) power after CWA's governing body was restructured, because none of those cases addressed that question.

As discussed above, in *Clearfield*, the Commonwealth Court resolved *Burke*'s erroneous dicta. However, *Clearfield* did not consider whether an incorporating municipality retains its conveyance power when an authority expands beyond that incorporating municipality's borders or when new municipalities are added by consent or through legislative action. No such facts were before the court in *Clearfield*.

Later, in *Forward Twp.*, the Forward Township Sanitary Sewage Authority argued that Forward Township could not "effectively dissolve" the authority by forcing it to convey all of its property to the township without assuming the authority's debts. *Forward Twp*., 654 A.2d at 174. In addressing the authority's ability to object to the municipality's effort to acquire the authority under Section 18(A), *Forward Twp.* relied on *Clearfield* for its holding that an authority has no powers under Section 18(A). Describing the function of Section 18(A), the Commonwealth Court then stated, "pursuant to section 18(A), a municipality may, by ordinance, impose upon an authority the duty of executing the necessary documents for a transfer of all of the authority's property **to its creating municipality**." *Forward Twp.*, 654 A.2d at 175 (citing *Cnty. of Mifflin v. Mifflin Cnty. Airport Auth.,* 437 A.2d 781 (Pa. Commw. 1981) (emphasis added)). Although *Forward Twp.* employed the phrase "creating municipality," it did not draw those words from the

text of Section 18(A); it was referencing the fact that the township was, in fact, the incorporating municipality and the "creating municipality" for purposes of Section 14 of the 1945 MAA. In *Mifflin*, the Commonwealth Court used the phrase "creating municipality" only once, and it did so when quoting directly from the text of Section 14 of the MAA. *See Mifflin*, 437 A.2d at 783.[31] Thus, *Forward Twp.* did not hold that Section 18(A) only applies to incorporating or creating municipalities.

Similarly, in *Twp. of Forks*, Forks Township sought to dissolve the authority it created, the Forks Township Municipal Sewage Authority. *Twp. of Forks*, 759 A.2d at 49. Citing *Forward Twp.*, *Twp. of Forks* stated that Section 18(A) "authorizes the Township to acquire a project after assuming all obligations related thereto. The Township created the Authority and, under Section 18(A) of the Act, it has the power, without the consent of the Authority, to order the Authority to comply with the Township's Resolutions to pay off all Bonds and debt, convey all of its assets and dissolve the Authority." *Id*. at 52. Again, the use of the term "created" was important because of the interaction with Section 14 of the 1945 MAA, not because incorporating authorities will hold the conveyance power described in Section 18(A) in perpetuity.

There were no issues in *Clearfield, Forward Twp.*, or *Twp. of Forks* involving additional participating municipalities, reorganized authorities, or the capacity of the incorporating municipality to establish, maintain or operate the targeted project, that

---

[31] Section 14 of the 1945 MAA, now codified as 53 Pa.C.S. § 5619, governs the termination of an authority. It permits an authority to unilaterally convey a "project" to the "municipality creating the authority" once all debts related to the project are resolved. *See* 53 Pa.C.S. § 5619(a). Separately, it permits the authority to unilaterally convey "all its property" to "the municipality or municipalities or" to a school district if the property is public school property. In *Forward Twp.*, the Commonwealth Court ultimately held that, because of the township's conveyance authority under Section 18(A), it had the power to order the authority to resolve its debts under Section 14(A) before the Section 18(A) transfer. *Forward Twp.*, 654 A.2d at 175.

would have cast doubt on the incorporating municipality's unilateral conveyance power under Section 18(A). All three cases involved an individual municipality's power to force a Section 18(A) conveyance where there was only one municipality that was eligible to force the conveyance—the incorporating municipality. Thus, our decision today does not upend the Commonwealth's precedent in those cases.[32]

---

[32] We expressly disapprove the Commonwealth Court's conclusion that its precedent became part of Section 5622(a) when the MAA was recodified in 2001 pursuant to Act 22. Neither Section 2 nor Section 4 of Act 22 effectively codified the intermediate court's prior interpretations of the 1945 MAA. Section 2 states that the recodified provisions of the MAA, "so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments[.]" Act of Jun. 19, 2001, P.L. 287, No. 22, § 2. Thus, the General Assembly has directed that the recodification of the MAA in Act 22 is just that, a recodification of the 1945 MAA, and as such, that it is not to be treated as a new enactment. In other words, for our purposes here, Section 5622(a) is a continuation of Section 18(A) of the 1945 MAA.

Section 4 states that, unless otherwise provided, "all activities initiated under the Municipality Authorities Act of 1945 shall continue and remain in full force" and that "[o]rders, regulations, rules and decisions which were made" thereunder "shall remain in full force and effect until revoked, vacated or modified under 53 Pa.C.S. Ch. 56." *Id*. § 4. Contrary to the Commonwealth Court's reading of this provision, the courts of this Commonwealth do not act, issue orders, rules, or decisions under the MAA. The orders, regulations, rules and decisions referenced in Section 4 refer to "activities" undertaken by authorities, municipalities, and related entities that were operating under the 1945 MAA. Thus, neither Section 2 nor Section 4 of the MAA mandated the de facto codification of intermediate court decisional case law concerning the MAA.

Moreover, as a general matter, considering the Commonwealth Court's conclusion that its case law could be viewed as binding decisional law outside of the confines of the Commonwealth Court itself, we remind that for purposes of ascertaining legislative intent under Section 1922(4) of our Rules of Construction, a court may presume that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. § 1922(4). For purposes of state statutory law, this Court, and not the Commonwealth Court, is the court of last resort. PA. CONST. Art. 5, § 2 ("The Supreme Court … shall be the highest court of the Commonwealth[.]"); *Warehime v. Warehime*, 860 A.2d 41, 48 n.9 (Pa. 2004) (concluding that because there were no "preserved issues of federal law" that this Court is "the court of last resort"); *see also Commonwealth v. Dickson*, 918 A.2d 95, 110 (Pa. 2007) (Cappy, C.J., concurring) ("There is no question that the Superior Court is not the 'court of last resort' in Pennsylvania—it is the Supreme Court of Pennsylvania."). The Commonwealth Court's
(continued…)

Although Section 5622(a) did not provide City with perpetual and unilateral powers under Section 5622(a), City is a municipality that may exercise Section 5622(a) powers if the other terms of Section 5622(a) are satisfied. Thus, we now turn to the project-defining clause to determine whether City retains the power it once had over CWA's projects.

Today, all of CWA's projects are maintained by the CWA as it is currently constituted, i.e., as governed by the New Board that was legislatively mandated under Section 5610(a.1). As discussed above, a "project" is defined in the present tense as "any structure, facility or undertaking" that "**an authority is** authorized to acquire, construct, finance, improve, maintain or operate, or provide financing for insurance reserves under the provisions of this chapter, or any working capital which an authority is authorized to finance under the provisions of this chapter." 53 Pa.C.S. § 5602 (emphasis added). Thus, all of CWA's projects are statutorily defined as projects that the New Board-led CWA currently has the power to control. By contrast, there are no CWA projects that the Old Board-led CWA continues to have the power to control, because the Old Board-led CWA no longer exists. Consequently, CWA's projects are no longer "of a character" which City, unilaterally speaking, "has power to establish, maintain or operate" as it once did when it had sole control of CWA's board. 53 Pa.C.S. § 5622(a). Stated otherwise, the CWA's projects are now of a character that the participating municipalities (Chester County, Delaware County and City, collectively) have the "power to establish, maintain or operate." *Id*.

To be clear, this does not mean that Section 5610(a.1) amended Section 5622(a). The text and meaning of Section 5622(a) have remained unchanged following Act 73. But that does not mean that Section 5610(a.1) had no practical effect on how Section

view—that its case law is baked into the MAA—suggests that its prior decisions are not subject to challenge in the Supreme Court of Pennsylvania and is untenable for that reason.

5622(a) operates in individual cases. The Commonwealth Court's error was overreading its own case law to assume, incorrectly, that Section 5622(a) only applied to incorporating municipalities, even though Section 5622(a)'s plain text does not mention incorporating or creating municipalities at all. The legislative intent behind that omission is dispositive here, because the MAA repeatedly refers to incorporating or creating municipalities elsewhere throughout the MAA. And it is through the more general language employed by the General Assembly in Section 5622(a), in conjunction with the MAA's definition of a project, that Section 5622(a)'s meaning becomes clear. Section 5622(a) defines a conveyance power held by an authority's incorporating municipality at the authority's inception, but it also contains the capacity to adapt to how authorities and municipalities evolve over time. As such, Section 5622(a) may apply to the incorporating municipality as it did in *Clearfield, Forward Twp.*, and *Twp. of Forks*, but it may also apply to multiple municipalities, either when participating municipalities are added by mutual consent or, as in this case, when an authority is reorganized under multiple municipalities by legislative command, as required under Section 5610(a.1).

The equitable arguments of all parties are not trivial, but none of them drive our analysis; the unambiguous text of Section 5622(a) does. Section 5622(a) adapts to changing circumstances, and in doing so it accounts for at least some of the equitable concerns that arise when an authority expands and changes over time beyond its original design, however imperfectly it may do so. Any imperfections in that legislative design are the General Assembly's concern.

Thus, we hold that the plain text of Section 5622(a), in conjunction with the definition of a project and the authority-restructuring provisions of Section 5610(a.1), clearly answer the remaining questions before us today. City no longer possesses the unilateral authority under Section 5622(a) to acquire its projects because those projects

are no longer projects "of a character" that City "has power to establish, maintain or operate" as they once were when CWA was governed by the Old Board. 53 Pa.C.S. § 5622(a).[33] And, because the CWA's projects are now governed by the New Board, City,

---

[33] Without identifying any specific defect in our statutory interpretation of the plain text of Section 5622(a), the Dissent maintains that this conclusion results in a downstream absurdity under Section 5619(a), which also concerns "an authority's conveyance of projects." Dissenting Op. at 10. Section 5619(a) permits an authority, "subject to agreements concerning the operation or disposition of the project," to "convey the project to the municipality creating the authority[.]" 53 Pa.C.S. § 5619(a). The Dissent asserts that "[t]his plainly means that 'the municipality creating the authority' retains inherent power to establish, maintain, or operate the projects of the authority because, as long as the other conditions of 5619(a) are satisfied, the authority can always convey its projects to the municipality that created it." Dissenting Op. at 11 (quoting 53 Pa.C.S. § 5619(a)). The Dissent further opines that this is because "[i]t would be nonsensical for the legislature to permit an authority to convey its projects to the creating municipality under Section 5619(a) if the creating municipality did not have the power to maintain or operate those projects." Id.

Section 5619(a) concerns an existing authority's power to convey a project to the municipality that created the authority that established a project. Section 5622(a) concerns a municipality's power to force an authority to convey a project. These are distinct powers articulated with different language, and nothing in the text of the MAA dictates that Sections 5619(a) and 5622(a) are symmetrically related. Indeed, the "power to establish, maintain or operate" language is a condition of Section 5622(a)'s project-defining clause but does not appear in Section 5619(a). In the context of this case, this means that Section 5619(a) permits (but does not require) the New Board to direct the CWA to convey an individual project to City (if that project was established under the Old Board). However, as we hold today, the plain text of Section 5622(a) does not permit City to unilaterally force that same conveyance.

The text of the MAA speaks for itself. The General Assembly placed greater restrictions on a conveyance forced by a municipality under Section 5622(a) than on a conveyance that an authority is permitted to effectuate under Section 5619(a). Because Section 5619(a) is permissive, it seems highly unlikely that a multi-jurisdictional authority would convey a project to an individual municipality that alone lacked the power to maintain or operate it. Nonetheless, Section 5619(a) conveyances are subject "to agreements concerning the operation or disposition of the project." 53 Pa.C.S. § 5619(a). Any deficiencies in a municipality's power to maintain and operate a project conveyed under Section 5619(a) may be remedied by agreements under that provision's plain text. Thus, we disagree with the Dissent that any downstream absurdity arises in Section 5619(a) due to our interpretation of Section 5622(a).

Chester County, and Delaware County are now the "proper authorities" that "may by appropriate resolution or ordinance" wield Section 5622(a)'s conveyance power.

While our decision today definitively resolves City's declaratory judgment action, it does not answer all remaining issues regarding the Trust Petition. Thus, we remand to the Delaware County Court of Common Pleas for further proceedings with respect to the Trust Petition.

## Conclusion

*Burke*'s statements indicating that an authority has the power to initiate a Section 5622(a) conveyance were dicta. The plain text of Section 5622(a) does not require an authority to initiate or assent to a conveyance of its projects. Municipalities that seek to wield Section 5622(a)'s conveyance power may only do so insofar as the targeted projects for acquisition are of a present character that the municipalities have the power to establish, maintain or operate. In the context of this case, this means that City no longer possesses the unilateral power to acquire CWA's projects under Section 5622(a). In order to acquire CWA's projects, City, Chester County and Delaware County, the legislatively designated municipalities that share governance over the CWA, are now the "proper authorities" referred to in Section 5622(a) who may demand conveyance of CWA projects under that provision. Consequently, we reverse the order Commonwealth Court.

Chief Justice Todd and Justices Wecht and McCaffery join the opinion.

Justice Dougherty concurs in the result.

Justice Mundy files a concurring and dissenting opinion.

Justice Brobson did not participate in the consideration or decision of this matter.